IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

SHAWANDA WHITLOW,                    )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )        CIVIL ACTION NO. 3:08CV159-SRW
                                     )                  (WO)
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
        Defendant.                   )

## MEMORANDUM OF OPINION

Plaintiff Shawanda Whitlow brings this action pursuant to 42 U.S.C. § 405(g) and
§ 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security
("Commissioner") denying her applications for disability insurance benefits and
supplemental security income under the Social Security Act. The parties have consented to
entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon
review of the record and briefs submitted by the parties, the court concludes that the decision
of the Commissioner is due to be affirmed.

## BACKGROUND

Plaintiff graduated from high school and cosmetology school in 1999 and has worked
as a cashier, newspaper "inserter," machine operator at a sewing plant, packer for a
manufacturer, assembler at a battery manufacturer, and textile trimmer. (R. 75, 89-90, 93,
155-57). In July 2004, plaintiff was in a motor vehicle accident in which she was rear-ended;
she struck the left side of her head on the car window. (R. 241). The following day, she

sought treatment at the emergency room for complaints of neck pain and decreased range of motion in her right arm.  Cervical x-rays were negative, and plaintiff was diagnosed with whiplash and treated with medication.  (R. 214-21).  Plaintiff sought treatment from Dr. Eric Hemberg of Valley Family Physicians, LLC, in August 2004 for pain on her left side, due to the accident.  Dr. Hemberg diagnosed soft tissue injury to plaintiff's neck, thoracic and lumbar areas.  In September 2004, plaintiff complained of continued neck pain, stating that she could "hardly move her neck."  Dr. Hemberg did not detect any significant muscle spasm.  He sent her for physical therapy and prescribed medication.  (R. 163-64).

In January 2005, plaintiff appeared at the emergency room complaining of a migraine headache with blurred vision, nausea, vomiting, and sensitivity to light, reporting that this migraine was the worst she had had since her accident in July.  The ER physician diagnosed migraine and treated plaintiff with Demerol, Phenergan and Thorazine. (R. 191-97).  Plaintiff returned to Dr. Hemberg on February 11 and 22, 2005, seeking treatment for migraine headaches. She reported that she had experienced an average of two headaches per week for the past six months.  Dr. Hemberg treated plaintiff with medication and gave her Imitrex to use with her next headache. On February 25th, she sought treatment for a nose-bleed which had led to coughing up blood; she reported that her "[m]igraine headache is better."  Dr. Hemberg advised her to "[c]ontinue Imitrex for the present time as she is getting relief with it."  (R. 161-62). A note in plaintiff's treatment record dated February 28, 2005 states, "Pt notified she can work w/ headache."  (R. 161). Plaintiff was treated in the emergency room on March 13, 2005 for migraine headache, with Demerol, Phenergan and Thorazine.  (R.

184-88).

On March 17, 2005, plaintiff sought treatment from Dr. Rutilio Garcia, reporting a "history of on-and-off but persistent 'migraine headache.'" She told Dr. Garcia that the Imitrex "did not help." Dr. Garcia found no abnormalities upon examination. He diagnosed migraine headache and prescribed Cephradine. He scheduled plaintiff for a CT scan of the head. The CT scan was normal. (R. 166,189). The following day, March 18th, plaintiff called Dr. Garcia's office and stated that she forgot to tell them that she "'fell out today, got dizzy + hit head." She was advised to see a neurologist. (R. 166). Late that afternoon, the plaintiff went to the emergency room, reporting that she had "passed out" at around 12:30 p.m. and hit her head on the wall; she complained of a migraine headache with dizziness, nausea and vomiting and pain at a level of 10 on a scale of 10. However, plaintiff left the ER without seeing the physician or receiving treatment. (R. 180-82). Plaintiff returned to Dr. Garcia on March 31, 2005 to seek treatment for the earlier episode of passing out and also for "on-and-off ringing in the ears." Dr. Garcia noted that plaintiff's hearing test was normal and the MRI of her head was negative; he prescribed Antivert for dizziness and referred plaintiff to a neurologist. (R. 165).

In early April 2005, plaintiff filed applications for disability insurance benefits and supplemental security income, alleging disability since July 24, 2004 due to "blackouts" and migraines. (R. 46, 88, 95). Plaintiff saw Dr. Chivukula of East Alabama Neurology on April 13, 2005. She reported headaches of moderate severity, with dizziness, nausea, photophobia, and blurred vision, and said that she had "passed out" twice. Dr. Chivukula diagnosed

headache, noting that plaintiff had "classical features of migraine[.]" Dr. Chivukula prescribed medications and ordered an MRI, EEG and CT scan. (R. 170-72). Plaintiff returned to the emergency room on April 22, 2005, complaining of a severe headache with blurred vision, nausea, and light sensitivity. She was treated with Demerol, Phenergan, Thorazine and Toradol. (R. 174-79).

On May 13, 2005, plaintiff returned to Dr. Hemberg with complaints of migraine, left-side numbness and left ear drainage. She reported that she was "having a different type of headache which is not as severe[.]" Dr. Hemberg prescribed an antibiotic for plaintiff's left ear infection and Tylenol # 3 for her headache. He provided her with samples of Relpax "to try with her next migraine." (R. 234). Plaintiff presented to Dr. Hemberg on June 20, 2005 with migraine headaches, reporting that she "[d]id get some relief with Relpax." Dr. Hemberg gave plaintiff a shot of Phenergan for her nausea, increased her dosage of Topamax, and prescribed Panlor for her headache. (R. 233). She sought treatment from him for another migraine headache on July 7, 2005. (R. 232).

Thereafter, the record does not reflect that plaintiff sought treatment from any practitioner for over ten months.[1] She sought treatment from Dr. Hemberg on May 15, June 6, and July 6, 2006 for headaches. Dr. Hemberg's diagnosis on all three occasions was "Migraine, Unspecified, without mention of intractable migraine (346.90)[.]" (R. 271-75).

On August 23, 2006, plaintiff was evaluated by Dr. Robert Slaughter, a neurologist

---

[1] A note in Dr. Hemberg's treatment record dated July 15, 2005 notes that plaintiff's referral to Dr. Garcia for a three month period beginning July 14, 2005 was approved, but the record contains no treatment notes from Dr. Garcia other than those in March 2005. (R. 232).

at UAB School of Medicine.  She reported a progressively severe daily headache problem since her accident: severe, incapacitating headaches three days a week, associated with nausea and sensitivity to light and noise, and moderate headaches on other days. Dr. Slaughter found no abnormalities on physical examination, except that plaintiff had "marked [diffuse] tenderness to palpation over the left occiput."  He diagnosed chronic posttraumatic migraine and superimposed medication overuse headache.  He noted that she "probably has comorbid depression as well."  He discontinued plaintiff's p.r.n. pain medications and prescribed a new medication regimen.  He referred plaintiff for a left greater occipital nerve block, and copied Dr. Hemberg on the report of evaluation. (R. 241-42).  Plaintiff returned to Dr. Hemberg six days later, reporting severe headache and pain in the left side of her body. Dr. Hemberg noted "tender L side of neck to even light palpation; symptoms outweigh findings."  He noted that Dr. Slaughter had recommended an occipital nerve block and noted, "will arrange occipital nerve block."  (R. 270).

Two months later, plaintiff returned to Valley Family Physicians with a complaint of headache.  She was examined by Dr. Nadia Cameron, whose diagnosis was the same as Dr. Hemberg's: "Migraine, Unspecified, Without Mention of Intractable Migraine (346.90)." (R. 265-66).  Dr. Cameron next treated plaintiff for headache pain on November 6, 2006 and again in late November.  On November 26, 2006, plaintiff characterized her headache as "mild" and also complained of low back pain "when she is about to have a severe migraine." (R. 259-64).

On January 24, 2007, plaintiff returned to the UAB neurologist, Dr. Slaughter, for

follow-up.  Plaintiff reported that her headaches had worsened in severity.  Dr. Slaughter noted that he did not think plaintiff was compliant with her prescribed medications, and also that she had been non-compliant with his treatment recommendations. (R. 240).

Five months later, on June 18, 2007, plaintiff reported to Dr. Slaughter for a follow-up visit.  She reported compliance with her medication regimen and that her headaches were "slightly better" and were severe only two or three days a week instead of every day. Plaintiff reported frequent "seizures."  Dr. Slaughter noted that "[s]he says that she has reproted this to me on both of her previous clinic visit[s], but there is no note of it.  She says that she began having spells back in July of 2006 which involves shaking of the upper and lower extremities bilaterally followed by biting of her tongue and subsequent loss of consciousness for several minutes. . . . She has had about 25 of these in the five months since I saw her last."  Dr. Slaughter noted that he planned to "check an MRI scan of the brain with contrast and EEG."  He noted a primary diagnosis of chronic daily headache with migraines, and stated, "The patient also has spells which are rather peculiar base[d] on history and I am not confident that they represent seizures."  (R. 245).

Plaintiff next sought treatment on August 8, 2007, when she reported to Dr. Cameron that she had a motor vehicle accident three years previously and has "daily back pain."  She also complained of left ankle pain. Lumbar spine x-rays were normal, and an MRI of plaintiff's lumbar spine on August 13, 2007 was negative. On August 22, 2007, plaintiff returned to Dr. Cameron complaining of an intermittent headache for four days, with the symptoms not aggravated by noise or light, and no blurring or vision or vertigo.  Plaintiff

reported back pain associated with her headache.  On September 4, 2007, plaintiff sought treatment from Dr. Cameron for back pain.  Dr. Cameron noted no abnormal findings on physical examination, and diagnosed lumbago.  (R. 250-53).

On October 2, 2007, after the claim was denied at the initial administrative level, an ALJ conducted an administrative hearing.[2]  The ALJ questioned plaintiff at the hearing.  She testified that she lives with her two children, aged eight and five, and that she gets them up in the morning at 6:00 a.m. and fixes their breakfast. They catch the bus to school at 7:30 and return from school at 3:30.  After she puts them on the bus, she tries to do a little cooking, cleaning or laundry. She tries to do "a lot" until she has a migraine. When she has a migraine, it is "hard for [her] to do any work around the house because [if] she stand[s] up too long, [her] back start[s] hurting or [her] left side will get numb and so [she has] to sit down or lay down for a couple of minutes or an hour and then see how, see how [she's] feeling after that." (R. 295).  She testified, "And then, I'll start back cleaning up or whatever I had to stop doing before I started having my migraine." (Id.).  Plaintiff testified that she has a migraine once a week and it lasts three to four days.  She described her migraine as "[t]hrobbing, my vision get blurry, numbness on my left side, my hearing, light, since I can't, the light hurts my eyes, noise and I get to shaking a lot when I'm having a migraine."  (Id.)  She takes Imitrex, and if she catches it before the migraine starts, it helps for the first two days, and then the headache "come[s] back stronger" on the third or fourth day.  (Id.).  She attends

---

[2]  The hearing was originally scheduled for November 7, 2006. The ALJ continued the hearing because plaintiff's previous attorney withdrew the day prior to the hearing and plaintiff wanted to seek other representation. (R. 284-90).

church every Sunday when she is not having a migraine.  She takes her children to church, and they attend every Sunday.  (R. 296-97).  On questioning by her attorney, plaintiff testified as follows:

> Q.  Ms. Whitlow, it sounds like you can function okay when you're not having a migraine or getting over one, is that true?
>
> A.  Yes, sir.
>
> Q.  But while the migraine headache is there, what do you do or what are you able to do?
>
> A.  Pretty much nothing.
>
> Q.  I mean do you lie down while the headache is on or do you take medication or what do you do?
>
> A.  I take my medicine and then I lie down, but I wait a few minutes after I take my medication, before I lie down.  Because the medication make me dizzy, weak, and sleepy.
>
> Q.  All right so do you end up in bed --
>
> A.  Going to sleep.
>
> Q.  In a dark room, I guess?
>
> A.  Yes sir.
>
> Q.  For the time that it takes for the headache to go away?
>
> A.  Yes sir.
>
> Q.  Now you told on one of the documents that we submitted to Social Security, you had told them in the past that you used to have these headaches every day?
>
> A.  Yes sir.
>
> Q.  What changed it from every day to once a week?

8

A.  It, the medication, the medication that they had gave me only, Depakote and Depakote and Provil.  The only one that really slowed it down from being everyday migraine.

Q.  Okay.  You're able to function okay when you're not having a migraine?

A.  Yes sir.

Q.  You're able to take care of your children, go to school, cook for them, go to the grocery store?

A.  Yes sir.

Q.  What about driving a car?

A.  It's impossible to drive a car when I'm having a migraine.

Q.  So when you're not having a migraine, do you drive?

A.  No.

Q.  Short distance occasionally?

A.  Yeah, probably to the school or to the grocery store or back home.

(R. 297-99).  Plaintiff testified that she was then having a migraine which had started five

hours previously, and that it "got me shaking."  (R. 299).

A vocational expert classified plaintiff's past relevant work as a cashier, assembler,

inserter, and textile trimmer as light and unskilled.  He classified her past work as a packer

in manufacturing and a trimmer in a fabrication plant as medium and unskilled, and her work

as a machine operator as light and semi-skilled.  He testified that, if plaintiff were limited as

described in Exhibit 5F,[3] she could perform her past relevant work.  He testified that if she

were limited as she had testified, she could not do her past relevant work or other work in the

---

[3] Exhibit 5F is at R. 223-30.

national economy, based on the described severity of her pain, which would distract her from being able to focus on her job.  He further testified that employers tolerate "[a]pproximately two days per month" of absenteeism in unskilled, entry-level workers.  (R. 300-02).

The ALJ rendered a decision on November 1, 2007.  The ALJ concluded that plaintiff suffered from the severe impairment of migraine headaches."  (R. 14).  He found that plaintiff does not have an impairment or combination of impairments which meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform  her past relevant work.  Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act.  On January 25, 2008, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner.  Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145.  Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity

attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff challenges the Commissioner's decision, arguing that the ALJ failed to assess plaintiff's complaints of pain properly and that he failed to consider plaintiff's medically-related absenteeism in determining whether she could return to her past relevant work.  Plaintiff contends that, while the ALJ found that she suffers from the severe impairment of migraine headaches, he erred by failing to credit her testimony that the intensity, frequency and  migraines are disabling and that "[t]he best the ALJ could muster was the ultimate conclusion that he did not believe that Ms. Whitlow's testimony was accurate."  (Doc. # 12, p. 9).

Eleventh Circuit law does not require the ALJ to accept a claimant's testimony regarding subjective symptoms.  Rather, where the evidence establishes that a claimant has an underlying medical condition which could reasonably give rise to the claimed symptoms, the ALJ must consider the claimant's testimony.   However, the ALJ may reject the testimony.  If the ALJ does so and the testimony is critical, the ALJ must articulate specific and adequate reasons for rejecting or discounting the testimony.  See Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005); see also Arnold v. Heckler, 732 F.2d 881, 883 (11th Cir. 1984)("The record and the judge's findings clearly show that the judge accepted the fact that

Arnold suffered from migraine headaches that did, indeed, produce pain, but he did not believe her testimony that the pain is so severe that she cannot engage in substantial gainful activity. Therefore, the crucial issue in this case is Arnold's credibility.").

In this case, the ALJ determined that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" and that she had "exaggerated her symptoms and restrictions." (R. 16, 17). The ALJ articulated several reasons for this determination: (1) plaintiff is able to cook, clean, perform household duties and care for young children in the household; (2) no physician has placed any restrictions on her activities; (3) plaintiff was non-compliant with Dr. Slaughter's treatment recommendations and prescribed medications; (4) Dr. Slaughter noted that plaintiff's described symptoms were "rather peculiar based on history" and that he was not confident they represented seizures; (5) plaintiff has not been treated in the emergency room since 2005; (6) there is no evidence that she received any treatment at all from July 2005 until May 2006; (7) Dr. Cameron's diagnosis was unspecified migraines "without mention of intractable migraine." (R. 17).

In her brief, plaintiff addresses only the first of the reasons articulated by the ALJ. she argues that her migraine headache symptoms "impact[] . . . plaintiff's ability to perform all functions of life approximately four times each month lasting between three and four days each time. During other parts of the month, the plaintiff is capable of performing normal daily activity." (Doc. # 12, p. 8). Even assuming that plaintiff's ability to engage in housework and childcare activities is an inadequate basis for rejecting her testimony, the

remaining reasons articulated by the ALJ are both adequate and supported by substantial evidence.  As the ALJ notes, there is no evidence that plaintiff sought treatment for her migraines for the ten-month period between July 2005 and May 2006.  (See Exhibits 1F through 9F).  See Lanier v. Commissioner of Social Security, 252 Fed. Appx. 311, 314 (11th Cir. 2007)(noting, with approval, ALJ's consideration of intermittent treatment on issue of credibility).  Additionally, as the ALJ observed, none of plaintiff's physicians placed any restrictions on her activities.  (Id.); see Turberville ex rel. Rowell v. Astrue, 316 Fed. Appx. 891, 893 (11th Cir. 2009)(citing Arnold, supra, for its determination that it was significant that no doctor found the claimant disabled).  The ALJ further cited plaintiff's noncompliance with Dr. Slaughter's treatment recommendations.  Dr. Slaughter noted that it did not appear that plaintiff was taking her medications as prescribed and there is no indication in the record that plaintiff followed through with Dr. Slaughter's recommendation that she address her migraine pain with a left occipital nerve block.  See Exhibits 7F, 8F; Ellison v. Barnhart, 355 F.3d 1272, 1275-76 (11th Cir. 2003)(ALJ may consider non-compliance as a factor in discrediting allegations of disability).[4]  Additionally, the record supports the ALJ's observations that Dr. Slaughter indicated that plaintiff's described symptoms were "rather peculiar based on history" and that he was not confident they represented seizures (R. 245), that plaintiff had not received treatment in the emergency room after 2005 (see Exhibit 4F[5]),

---

[4]  Plaintiff offered no evidence that she had the occipital nerve block or of her reason for declining to undergo the recommended procedure.  In this case, as in Ellison, plaintiff's non-compliance is one of several reasons articulated by the ALJ for his finding.

[5]  The last record of emergency room treatment is dated April 22, 2005.  (R. 174).

and that Dr. Cameron repeatedly diagnosed unspecified migraines "without mention of intractable migraine" (R. 253, 260, 264). Because the reasons articulated by the ALJ for discrediting plaintiff's testimony are adequate and supported by substantial evidence, the ALJ did not err in his credibility determination.

Additionally, the court rejects plaintiff's argument that the ALJ erred by failing to explicitly consider absenteeism tolerance. The ALJ was aware of the vocational expert's testimony regarding employers' tolerance of absenteeism in unskilled, entry-level positions. (R. 302). As discussed above, he determined that plaintiff's description of the severity and frequency of her headaches was "not entirely credible," and this conclusion is supported by substantial evidence. It is apparent from the ALJ's RFC finding that he did not credit plaintiff's pain testimony to the extent that it would require her to miss more than two days of work per month. In his discussion of residual functional capacity, the ALJ cited 20 C.F.R. § 404.1545, § 416.945, and SSR 96-8p. (R. 13). There is nothing in the ALJ's opinion to indicate that he was unaware that the RFC assessment measures the claimant's capacity for work activity "on a regular and continuing basis." 20 C.F.R. § 404.1545(b),(c); § 416.945(b), (c); SSR 96-8p (stating, in its first sentence, that "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."). The ALJ concluded that plaintiff retained the RFC to perform her past relevant work; he was not required to make a separate finding on the absenteeism issue. See Wilson v. Barnhart, 210 Fed. Appx. 448 (5th Cir. 2006)("An

ALJ is not required to make 'an explicit finding in every case that the claimant cannot only engage in substantial gainful activity but maintain that employment as well.'")(quoting Dunbar v. Barnhart, 330 F.3d 670, 672 (5th Cir. 2003)).

The ALJ's finding that plaintiff suffers from the severe impairment of "migraine headaches" is not inconsistent with his conclusion that she is able to perform her past relevant work.  See Arnold, 732 F.2d at 884 ("It may well be that Arnold is not able to work without some pain or discomfort, but this does not necessarily satisfy the test for disability under the Act. It was not inconsistent for the administrative law judge to find that Arnold suffers pain in fact, and yet is not so severely impaired as to meet the stringent test for disability imposed by the Act. It was for the administrative law judge to determine the disabling nature of the pain.").

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law and, accordingly, that it is due to be AFFIRMED.  A separate judgment will be entered.

Done, this 17th day of May, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

15